COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Chief Judge Decker, Judges Ortiz and Chaney
Argued at Fairfax, Virginia


ROBERT K. HARWOOD, L.C.

v.       Record No. 1600-24-4

JUAN CARLOS ARANIBAR CHINCHILLA, ET AL.                    OPINION BY
                                                          JUDGE DANIEL E. ORTIZ
LLOYD MARTIN, PLC                                          SEPTEMBER 30, 2025

v.       Record No. 1605-24-4

JUAN CARLOS ARANIBAR CHINCHILLA, ET AL.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Christie A. Leary, Judge

John E. Rinaldi (Joanna E. Thomas; Walsh, Colucci, Lubeley &
Walsh, PC, on briefs), for appellant Robert K. Harwood L.C.

Matthew W. Lee (Natalie B. Jacobs; Wilson, Elser, Moskowitz,
Edelman & Dicker, LLP, on briefs), for appellant Lloyd Martin, PLC.

Michael T. Pritchard (Cesar M. Muir; Hogan & Pritchard, PLLC, on
briefs), for appellees.


These appeals require a Virginia appellate court to construe Code § 64.2-1617, a

provision of the Virginia Uniform Power of Attorney Act ("VUPOAA"), Code § 64.2-1600

through -1642, for the first time.  Relying on what it believed to be an authentic power of

attorney, Robert K. Harwood, L.C., loaned $750,000 to the purported attorney-in-fact, Carlos

Camacho, secured by a deed of trust on his principals' property.  As it turned out, Camacho had

fraudulently altered that power of attorney to grant himself additional powers and, to make the

fraudulent power appear legitimate, had affixed a signature page from another document

containing the authentic signatures of the principals.  The circuit court declared Harwood's lien

void ab initio after finding that, under the VUPOAA, Harwood could not rely on the fraudulent power of attorney because it contained a "forged signature." The court further ruled that Harwood was required to reimburse the principals for voluntary payments made on the loan to prevent foreclosure of their property.

We determine, first, that the circuit court correctly declared Harwood's deed of trust void, but for a different reason—the power of attorney on which Harwood relied was never "acknowledged." Then, notwithstanding the invalidity of Harwood's loan, we find that the court erred in ordering Harwood to reimburse the principals for voluntary payments made under the loan. We accordingly affirm in part and reverse in part the circuit court's judgment.

BACKGROUND

The facts relevant to our analysis are undisputed.

Juan Carlos Aranibar Chinchilla and Rossemary Jeanneth Arnez Villarroel (the "landowners") were a married couple who lived in Bolivia and owned several investment properties in Fairfax County, including 6011 Old Rolling Road and 6015 Old Rolling Road. The landowners allowed their brother-in-law, Carlos Camacho, to live at 6011 Old Rolling Road in order to "maintain it, keep it up, and make it livable" for when they would visit the U.S. In 2016, the landowners executed powers of attorney before a notary public formally granting Camacho the power to "leas[e], rent[], and manag[e]" these properties.

At some point thereafter, without the landowners' knowledge, Camacho fraudulently created a new "Special Power of Attorney" for 6011 Old Rolling Road by writing a new first page and affixing to it the notarized signature page from the authentic 6015 Old Rolling Road power of attorney. This fraudulent document granted Camacho expanded powers, specifically, the authority "to act for and [on] behalf [of the landowners] with respect to all matters relating to the borrowing and refinancing" of the property, including "execut[ing], acknowledg[ing] and

- 2 -

deliver[ing] any deed, contract, lease, note, [or] deed of trust." Subsequently in 2018, Camacho (as the purported agent for the landowners) took out a loan in excess of $700,000 against 6011 Old Rolling Road, secured by a deed of trust; the fraudulent power of attorney was attached to the deed of trust and recorded in the land records.

In 2020, Camacho sought to refinance that loan with Robert K. Harwood, L.C. Lloyd Martin served as the attorney for Harwood during this transaction, and his subsidiary, Potomac West Title, performed the settlement. Prior to closing, Martin diligently completed a title examination, during which, he found the 2018 deed of trust with the fraudulent power attached. After Harwood specifically requested via email that Martin review the power, Martin determined that nothing about it seemed out of the ordinary and that it was "properly notarized." Martin communicated this determination to Harwood, and he also had Camacho sign an agent's certification before a notary public, affirming the validity of the power. Harwood subsequently issued a $750,000 loan to Camacho, secured by a deed of trust on 6011 Old Rolling Road and evidenced by two promissory notes, one for $700,000 and the other for $50,000, satisfying the prior lien on the property. Martin served as trustee on the new deed of trust.

The landowners did not discover Camacho's fraud until November 2021, when he emailed them apologizing for his actions. To avoid being discovered, Camacho had set up at least one new bank account in the name of the landowners' LLC to receive the proceeds and make payments. He also made timely payments on the Harwood loan until March 2022. Camacho eventually pleaded guilty to one felony count of forgery and uttering a forged writing under Code § 18.2-172 and one felony count of embezzlement under § 18.2-111.[1]

On April 15, 2022, after Camacho stopped making payments on the loan, Harwood issued a notice of default to the landowners. On April 28, Harwood issued a final notice of

---

[1] Camacho died on the day of his sentencing, January 6, 2023.

default prior to foreclosure, scheduling a foreclosure sale for May 31, 2022. By letter of counsel dated May 16, 2022, the landowners reinstated the loan, voluntarily agreeing to pay roughly $19,000 of the balance plus interest payments going forward "[i]n exchange for" Harwood cancelling the foreclosure sale. The landowners "remained current" through June 2023, but, after not receiving the July payment, Harwood sent another notice of default on July 10, 2023.

The landowners filed this action against Harwood and Martin in August 2023, seeking a declaratory judgment that the Harwood loan was void and to quiet title for the property at 6011 Old Rolling Road.[2] They also sought reimbursement for the payments they had made on the loan. In December 2023, the circuit court entered an order "by the agreement of the parties" enjoining Harwood and Martin from foreclosing on the property and ordering the landowners to continue making interest payments on the loan.

The case eventually went to trial. At the conclusion of the landowners' evidence, Harwood and Martin moved to strike, seeking shelter in Code § 64.2-1617(b)-(c) of the VUPOAA. Subsection (b) allows a person to "rely upon" an "acknowledged power of attorney" if they do so in good faith without actual knowledge that it is invalid *unless* the power of attorney contains a "forged signature." Subsection (c) allows a person "asked to accept an acknowledged power of attorney" to "rely upon without further investigation" an agent's certification as to "any factual matter concerning . . . the power of attorney." Harwood argued that subsection (b)'s "forged signature" carve-out did not apply because Camacho had affixed the actual signatures of the landowners from the authentic 6015 Old Rolling Road power of attorney to the fraudulent power he created. And regardless, it argued, Harwood and Martin had obtained an agent's certification from Camacho in this case. Finally, Harwood argued that the voluntary-payment

---

[2] The landowners later filed an amended complaint, the operative pleading in this case. They voluntarily dismissed Count III of the amended complaint, breach of fiduciary duty against Martin, at trial.

doctrine precluded the landowners from seeking reimbursement for interest payments they had made. The circuit court took the matter under advisement.

Following trial, the circuit court denied the motion to strike and ruled in favor of the landowners. The court held that its decision "turn[ed] on an analysis of [the VUPOAA]." The court compared the VUPOAA to the Uniform Power of Attorney Act ("UPOAA"), after which the VUPOAA was modeled. It noted that the General Assembly adopted Code § 64.2-1617(b) "in nearly its entirety" from the UPOAA, "save one exception"—the "forged signature" carve-out. Relying on the plain text of the statute and incorporating the definition of "forgery" from Virginia caselaw, the court rejected the defendants' "narrow" construction of "forged signature," which would mean an "individual physically taking a pen to paper and affixing the wet signature of another fraudulently to a document." The court determined that, "[b]y affixing the signature page containing the legitimate signatures of the [landowners] to a completely different document, Carlos Camacho forged the signatures in the same manner as if he had physically taken a pen to paper himself." Thus, the court ruled, Harwood and Martin "were not permitted to rely in good faith on the power of attorney presented," and the deed of trust and promissory notes were "voided." The court entered a final order to that effect and quieted title in favor of the landowners. Additionally, the court ruled that Harwood was required to reimburse the landowners in the amount of $148,759 for payments made since they reinstated the loan in May 2022.

Harwood and Martin timely filed separate appeals.[3]

---

[3] Lloyd Martin, the owner of Lloyd Martin, PLC, passed away during the pendency of this appeal.

STANDARD OF REVIEW

"We review questions regarding the validity and effect of deeds and other written legal documents," including powers of attorney, "de novo." *Evans v. Evans*, 290 Va. 176, 183 (2015); *Davis v. Davis*, 298 Va. 157, 168 (2019). In interpreting a written power of attorney, we employ both the provisions of the VUPOAA and common law principles. *Davis*, 298 Va. at 168. We review any questions regarding the construction of the VUPOAA de novo. *Reineck v. Lemen*, 292 Va. 710, 721 (2016).

ANALYSIS

On appeal, Harwood[4] does not challenge the circuit court's factual findings. Instead, it argues that the court erred in invalidating its lien because it was entitled to rely upon the fraudulent power of attorney under Code § 64.2-1617(b)-(c). Specifically, Harwood argues that the court erred in applying § 64.2-1617(b)'s "forged signature" carve-out because the term "forged signature" does not contemplate a real signature fraudulently removed from one document and affixed to another. Even if it did, Harwood argues, it was entitled to rely upon Camacho's certification under subsection (c). Additionally, Harwood contends that, assuming the circuit court did not err in declaring Harwood's lien void, the court erred in requiring Harwood to reimburse the landowners for payments made during the pendency of these proceedings.

Neither this Court nor our Supreme Court has yet construed Code § 64.2-1617. For the reasons articulated below, we find that the circuit court reached the right result—albeit for a different reason—in finding the deed of trust and promissory notes void ab initio, but we find that it erred in requiring Harwood to reimburse the landowners for their voluntary payments.

---

[4] Although Harwood and Martin filed separate appeals and opening briefs, for the sake of ease, we refer to both simply as "Harwood" unless the distinction is relevant to our analysis.

I.

A.

The well-settled principle in Virginia is that "[o]ne who deals with an agent does so at his own peril and has the duty of ascertaining the agent's authority." *Kern v. Freed Co.*, 224 Va. 678, 680 (1983); *Kern v. J.L. Barksdale Furniture Corp.*, 224 Va. 682, 685 (1983); *accord S. Amusement Co. v. Ferrel-Bledsoe Furniture Co.*, 125 Va. 429, 433 (1919). Therefore, "[i]f the agent exceeds his authority, the principal is not bound by the agent's acts." *Freed Co.*, 224 Va. at 680. In general, agents derive their authority from either the actual authority granted by their principal or from the apparent authority that a "third party reasonably believes [the] agent has, based on the third party's dealings with the principal." *Sanchez v. Medicorp Health Sys.*, 270 Va. 299, 303 (2005) (quoting *Apparent Authority*, *Black's Law Dictionary* (8th ed. 2004)); *see* Restatement (Third) of Agency § 7.04 ("A principal is subject to liability to a third party harmed by an agent's conduct when the agent's conduct is within the scope of the agent's actual authority or ratified by the principal . . . ."), *quoted in Parker v. Carilion Clinic*, 296 Va. 319, 343 n.12 (2018). But our Supreme Court has imposed more demanding requirements on those agents empowered as attorneys-in-fact. In Virginia, "a power of attorney will be strictly construed," and "[a]n act done by an attorney in fact which is not authorized by the power under which he acts is a nullity." *Bank of Marion v. Spence*, 155 Va. 51, 53 (1930). Thus, although in a typical agency relationship a principal may be bound if an agent acts with apparent authority, with respect to an attorney-in-fact relationship, a principal is not bound unless the action taken was actually authorized by the power of attorney.[5] *See id.*; *S. Ry. Co. v. Thomas*, 182 Va. 788, 793, 794 (1944) (finding appeal bond "wholly void" where attorney-in-fact filed in a location not

---

[5] For this reason, we reject at the outset Martin's argument that the landowners should be bound under the principles of apparent authority.

"expressly authorize[d]" by power of attorney); *Bank of U.S. v. Beirne*, 42 Va. (1 Gratt.) 234, 264 (1844) ("[W]hen the power [of attorney], whether it be conferred in express terms, or by fair implication, is once ascertained, the agent cannot depart from it. . . . He must do the very thing which he is empowered to do; and cannot substitute an equivalent."); *cf. Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294, 300 (1998) ("The authority of a special agent must be ascertained from the terms of the instrument itself. No authority will be implied from the terms of the instrument, except that authority indispensable to the exercise of the powers expressly conferred." (internal citation omitted)).

The General Assembly enacted its version of the Uniform Power of Attorney Act to "supplement" common law principles and clarify the rights and obligations of principals, attorneys-in-fact, and third parties in dealings involving powers of attorney. Code § 64.2-1619. Although the VUPOAA provisions at issue in this case are closely modeled on the UPOAA, the General Assembly deviated from it in key respects. Thus, a comparison of both texts is instructive to our analysis.

B.

In this case, the circuit court's analysis and the parties' arguments turned on a construction of Code § 64.2-1617, the analog to § 119 of the UPOAA. Section 119 was intended "to address the frequently reported problem of persons refusing to accept a power of attorney" by providing certain protections against liability to third parties who accept an "acknowledged" power of attorney. Unif. Power of Att'y Act prefatory note (Nat'l Conf. Comm'rs on Unif. State Ls. 2006) [hereinafter "UPOAA"]; *see* UPOAA § 119. According to the drafters, "[t]his approach promotes acceptance of powers of attorney, which is essential to their effectiveness as an alternative to guardianship." UPOAA § 119 cmt. Specifically, subsection (c) provides:

> A person that in good faith accepts an acknowledged power of
> attorney without actual knowledge that the power of attorney is

void, invalid, or terminated, that the purported agent's authority is void, invalid, or terminated, or that the agent is exceeding or improperly exercising the agent's authority may rely upon the power of attorney as if the power of attorney were genuine, valid and still in effect, the agent's authority were genuine, valid and still in effect, and the agent had not exceeded and had properly exercised the authority.

Subsection (d) provides further protection by authorizing a person who "is asked to accept an acknowledged power of attorney" to "rely upon, without further investigation . . . an agent's certification of any factual matter concerning the principal, agent, or power of attorney" or "an opinion of counsel as to any matter of law concerning the power of attorney if the person making the request provides in a writing or other record the reason for the request." Note that both provisions apply only to "acknowledged" powers of attorney—"acknowledged" under the UPOAA means "*purportedly* verified before a notary public or other individual authorized to take acknowledgements." UPOAA § 119(a) (emphasis added).

Our General Assembly adopted § 119 when it enacted the VUPOAA, but it made two changes that are relevant here. First, it changed the definition of "acknowledged" by removing the word "purportedly" before "verified." *See* Code § 64.2-1617(a). Second, the General Assembly fully incorporated the good-faith-exception in UPOAA § 119(c), but it added a second sentence: "The preceding sentence *shall not apply* to an acknowledged power of attorney that contains a forged signature of the principal." Code § 64.2-1617(b) (emphasis added).[6]

Here, the circuit court, after noting the distinction between UPOAA § 119(c) and Code § 64.2-1617(b), found that Harwood and Martin "were not entitled to rely on" the altered power of attorney because it contained a forged signature. The parties all argue that the resolution of this appeal turns on our construction of Code § 64.2-1617(b) and (c). They raise novel questions

---

[6] UPOAA § 119(d)'s agent certification exception was incorporated as Code § 64.2-1617(c) with the only change being the clarification that the "opinion of counsel" may be provided by counsel for the "principal," "agent," or "person" seeking reliance.

on how to define "forged signature" and, even if the document contains a forged signature, whether a third party may nonetheless seek shelter in subsection (c)'s agent certification protections. While the construction of and interplay between these two provisions are important questions,[7] for Code § 64.2-1617(b) and (c) to even apply, we must answer a key threshold question—whether the altered power of attorney was "acknowledged" within the meaning of § 64.2-1617(a).

When interpreting a statute, "our primary objective is 'to ascertain and give effect to legislative intent,' as expressed by the language in the statute." *Berry v. Bd. of Supervisors*, 302 Va. 114, 127 (2023) (quoting *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012)). We construe "[w]ords in a statute . . . according to their ordinary meaning, given the context in which they are used." *Id.* at 128 (quoting *City of Va. Beach v. Bd. of Supervisors*, 246 Va. 233, 236 (1993)). In so doing, "[w]e presume that the legislature chose, with care, the specific words of the statute and that [t]he act of choosing carefully some words necessarily implies that others are omitted with equal care." *West Virginia v. State Corp. Comm'n*, ___ Va. ___, ___ (Mar. 27, 2025) (second alteration in original) (quoting *Va. Elec. & Power Co. v. State Corp. Comm'n*, 300 Va. 153, 163 (2021)).

As noted above, Code § 64.2-1617(b) or (c) affords protection from liability to third parties who accept an "acknowledged power of attorney." Section 64.2-1617(a) defines

---

[7] The parties are not the only ones devoting attention to this question. Scholars examining the VUPOAA have similarly noted the ambiguity in the interplay between subsections (b) and (c). *See, e.g.*, Andrew H. Hook & Lisa V. Johnson, *The Uniform Power of Attorney Act*, 45 Real Prop., Tr. & Est. L.J. 283, 303 n.121 (2010) ("[I]t appears that under the [V]UPOAA, a third party that accepts a power of attorney with an agent's certification would be protected from liability under [Code § 64.2-1617(c)] despite Virginia's amendment of [§ 64.2-1617(b)]."); F. Phillip Manns Jr., *Powers of Attorney Under the Uniform Power of Attorney Act Including Reference to Virginia Law*, 43 ACTEC L.J. 151, 190 (2018) (noting ambiguity as to whether "an acknowledged power of attorney that contains a forged signature of the principal" under Code § 64.2-1617(b) is "nonetheless considered an 'acknowledged power of attorney' for purposes of subsection (C)").

- 10 -

"acknowledged" as "verified before a notary public or other individual authorized to take acknowledgments." The acknowledgment requirement dovetails with § 64.2-1603's presumption of genuineness, which was adopted nearly verbatim from UPOAA § 105. Section 64.2-1603 provides that "[a] signature on a power of attorney is presumed to be genuine if the principal acknowledges the signature before a notary public or other individual authorized by law to take acknowledgments." The UPOAA drafters commented that the purpose of this presumption was to "strongly encourage[] the practice" of notarizing the principal's signature. UPOAA § 105 cmt. Taken together with § 119, they further commented that the purpose of these provisions was "to promote acceptance of powers of attorney" by "allow[ing] a third party to follow the instructions of an agent as identified in an acknowledged power of attorney, without liability for doing so, if the third party was without actual knowledge of a defect in the power of attorney." UPOAA § 119 cmt.

In its substantial adoption of UPOAA §§ 105 and 119, our General Assembly clearly evinced an awareness of the uniform act and a similar concern for promoting acceptance of acknowledged powers of attorney as an alternative to guardianship. But, again, its adoption was not without key changes. Recall that the General Assembly altered the definition of "acknowledged"; while UPOAA § 119(a) defines "acknowledged" as "*purportedly* verified before a notary public or other individual authorized to take acknowledgements," (emphasis added), our General Assembly omitted the word "purportedly" in Code § 64.2-1617(a). Thus, while UPOAA § 119(a) allows a third party to rely on a power of attorney if the principal or agent merely "purport[s]" that the document is "verified before a notary public,"[8] our General

_____

[8] To "purport" means "to convey, imply, or profess outwardly (as meaning, intention, or true character)," or to "have the often specious appearance of being, intending, claiming (something implied or inferred)." *Purport*, *Webster's Third New Interntional Dictionary* (1993); *see also Purport*, *Black's Law Dictionary* (12th ed. 2024) ("To profess or claim, esp. falsely; to seem to be . . . .").

- 11 -

Assembly, by its specific omission of the word "purportedly," evinced a clear intent that a power of attorney must *in fact* be "verified before a notary public" for Code § 64.2-1617's protections to apply. Code § 64.2-1617(a); *see West Virginia*, ___ Va. at ___ ("We presume that the legislature chose, with care, the specific words of the statute and that [t]he act of choosing carefully some words necessarily implies that others are omitted with equal care." (alteration in original) (quoting *Va. Elec. & Power Co.*, 300 Va. at 163)).

This omission makes sense when considering that a more stringent acknowledgment requirement advances a slightly different legislative goal than what the UPOAA drafters contemplated. Although its enactment of Code §§ 64.2-1603 and 64.2-1617 demonstrates the General Assembly's shared concern for "promot[ing] acceptance of powers of attorney," it determined that third parties should bear more risk than they otherwise would under the UPOAA. The UPOAA places the risk of invalidity on the principal by allowing a third party to seek shelter under § 119(c) and (d) if an attorney-in-fact merely "purport[s]" that the power of attorney was notarized. UPOAA § 119(a), (b), cmt.; *see* Andrew H. Hook & Lisa V. Johnson, *The Uniform Power of Attorney Act*, 45 Real Prop., Tr. & Est. L.J. 283, 301 (2010). But, by requiring *actual* notarization of the document for subsections (b) and (c) to apply, Code § 64.2-1617(a) shifts some of that risk of invalidity to the third party. An examination of the subsequent subsection confirms this divergent legislative scheme. *See Phillips v. Rohrbaugh*, 300 Va. 289, 308-09 (2021) ("Our duty is to . . . 'interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal.'" (quoting *Eberhardt v. Fairfax Cnty. Emps.' Ret. Sys. Bd. of Trs.*, 283 Va. 190, 195 (2012)). While UPOAA § 119(c) provides no protection to principals against forgery, our Code's "forged signature" carve-out "expressly places the risk that a power of attorney is a forgery upon the third party accepting the power of attorney." Hook & Johnson, *supra*, at 302; *see* Code § 64.2-1617(b).

- 12 -

Taken together, a comparison of the relevant VUPOAA and UPOAA provisions demonstrates that our General Assembly envisioned a slightly—but critically—different legislative scheme than the UPOAA. We turn next to an analysis of the documents in this case.

## II.

Having established the requirements for a power of attorney to be "acknowledged" within the meaning of Code § 64.2-1617, application to the case at hand is straightforward. We first examine whether the protections of Code § 64.2-1617(b)-(c) were available to the lienors and then turn to whether the court erred in finding the liens void ab initio.

## A.

As an initial matter, we note that, "this Court may affirm the judgment of a circuit court if first, the circuit court arrived at the 'right result' but relied on different reasoning, and second, the appellate analysis is largely legal and does not require additional factual findings." *Esposito v. Va. State Police*, 74 Va. App. 130, 134 (2022). Here, the relevant facts are undisputed. In May 2016, the owners lawfully executed powers of attorney before a notary public, granting Camacho the power to manage and rent out the 6011 Old Rolling Road and 6015 Old Rolling Road properties. It is undisputed that Camacho created a new document for 6011 Old Rolling Road, granting himself additional powers not authorized under the original, attached the notarized signature page from the authentic 6015 Old Rolling Road power of attorney to the new document, and recorded that fraudulent document in the land records. Although the lifted signature page from the 6015 Old Rolling Road power had been notarized, the fraudulent document was never itself signed by the landowners before a notary public.

To obtain the protection of Code § 64.2-1617(b) or (c), Harwood and Martin had to rely on an "acknowledged power of attorney"—"acknowledged" meaning a power that has *in fact* been "verified before a notary public or other individual authorized to take acknowledgments."

*See supra* Part I.B. But that never happened. As discussed, Camacho simply attached the notarized signature page from the different, authentic power, and the landowners, whose grant of authority was purported to be "verified," were completely unaware of the new document. Thus, the altered power of attorney was not "acknowledged," and Code § 64.2-1617(b)-(c) is inapplicable to this case.

Harwood attempts to circumvent this fact by pointing out that the "signatures on the [fraudulent power of attorney] were those of [the owners,] and those signatures were properly acknowledged by a notary public." True. But this argument misunderstands the plain language of Code § 64.2-1617. Section 64.2-1617(b) and (c) refer to an acknowledged "*power of attorney*," not only an acknowledged signature. (Emphasis added). Put differently, to be "acknowledged," the complete document must be "verified before a notary public." Code § 64.2-1617(a). Although this language is clear on its face, our interpretation is reinforced by the fact that the General Assembly refers to a "signature" as distinct from a "power of attorney" elsewhere in the VUPOAA. *See, e.g.*, Code § 64.2-1603 ("A *signature* on a *power of attorney* is presumed to be genuine if the principal acknowledges the signature . . . ." (emphases added)); Code § 64.2-1617(b) ("The preceding sentence shall not apply to an acknowledged *power of attorney* that contains a forged *signature* of the principal." (emphases added)). Were we to hold otherwise and consider a power of attorney "acknowledged" when only a separately affixed signature page had been notarized, it would render meaningless the General Assembly's omission of the word "purportedly" from the VUPOAA. Indeed, attorneys-in-fact like Camacho—who *purported* that the entire altered power was verified when in fact only the original 2016 documents had been—could continue to bind principals. The General Assembly evinced a clear intent in its alteration of the language from the UPOAA that third parties in Virginia should bear the risk in such a circumstance, and we will not upset that intention.

B.

Having established that the lienors were not entitled to rely on the altered power of attorney, we must determine the legal effect of the Harwood lien, if any, on the owners.

Recall that "[a]n act done by an attorney in fact which is not authorized by the power under which he acts is a nullity." *Bank of Marion*, 155 Va. at 53; *see S. Ry. Co.*, 182 Va. at 793. There is no dispute that the original power for 6011 Old Rolling Road did not authorize Camacho to take out a loan against the property. Thus, Camacho acted outside the scope of the authority granted to him, and the written instruments to which Camacho purportedly bound the owners are a "nullity," meaning they have "no legal force or binding effect" and are treated as though they "never had any legal existence." *Kennedy v. Annandale Boys Club, Inc.*, 221 Va. 504, 506 (1980). We accordingly affirm the circuit court's judgment declaring the instruments void and quieting title, albeit for a different reason.

III.

Our analysis does not end there. Harwood also contests the second part of the circuit court's judgment ordering it to reimburse the interest payments made by the owners after receiving notice of foreclosure in April 2022. Harwood contends that, even if its lien is void, because the owners "voluntarily began paying . . . monthly interest payments to Harwood in place of Mr. Camacho," it was error for the court to direct reimbursement as a remedy. The landowners argue that their payments were not made voluntarily, but rather "under duress" due to the threat of foreclosure.

The voluntary-payment doctrine is well-established in Virginia:

> Where a person with full knowledge of the facts voluntarily pays a demand unjustly made upon him, though attempted or threatened to be enforced by proceedings, it will not be considered as paid by compulsion, and the party thus paying is not entitled to recover back the money paid, though he may have protested against the unfounded claim at the time of payment made.

- 15 -

*Williams v. Consolvo*, 237 Va. 608, 613 (1989) (emphasis omitted) (quoting *Wessel, Duval &*
*Co. v. Winborne & Co.*, 125 Va. 502, 510 (1919)). Our Supreme Court recently reiterated that
this doctrine "flows from the vigilance maxim," or the principle that "[e]very [person] is
supposed to know the law" governing their circumstances. *Sheehy v. Williams*, 299 Va. 274, 278
(2020) (quoting John L. Costello & Kent Sinclair, *Virginia Remedies* § 9-2 (5th ed. 2016)). The
circumstances in which "exceptions" to the voluntary-payment doctrine have been permitted are
"decidedly few." *Williams*, 237 Va. at 613. For example, "[w]here money has been paid under a
mistake of the facts, or under circumstances of fraud or extortion, or as a necessary means to
obtain the possession of goods wrongfully withheld from the party paying the money, an action
may be maintained for the money wrongfully exacted." *Id.* (quoting *Wessel*, 125 Va. at 510).
"But such action is not maintainable in the naked case of a party making a payment of a demand
rather than resort to litigation," even if that demand "subsequently turned out to be unauthorized
by law." *Id.* (emphasis omitted) (quoting *Wessel*, 125 Va. at 510).

The landowners rely heavily on *Vick v. Siegel*, 191 Va. 731 (1951), as support for their
argument that their payments were not voluntary. In *Vick*, an owner of real property subject to a
deed of trust found a buyer for his property. *Id.* at 733. The trustee of the deed of trust refused
to release the lien on the property and threatened to sell it unless the owner paid him an unlawful
commission. *Id.* at 733-34. The prospective purchaser refused to close the transaction until the
deed of trust was released. *Id.* at 734. The owner paid the commission to close the sale and
"save his property," and subsequently sued the trustee for return of the payment. *Id.* Finding for
the owner, the Court applied the principle that, "where one party has possession or control of the
property of another, and refuses to surrender it . . . except upon compliance with an unlawful
demand, a contract made by the owner under such circumstances to emancipate the property is to
be regarded as made under compulsion and duress." *Id.* at 734-35 (quoting *Harris v. Cary*, 112

- 16 -

Va. 362, 369 (1911)). Critical to the analysis was the fact that the owner "did not have time and opportunity to relieve himself from his predicament by resorting to legal methods" because "the purchaser might have been unwilling to wait" and he "might have lost the sale of his property." *Id.* at 735-36.

Our Supreme Court distinguished *Vick* in a case that bears significant similarities to the one at hand. In *Williams v. Consolvo*, Williams purchased real property unaware of the existence of a deed of trust encumbering it. 237 Va. at 610. He learned of the deed of trust only after the lienholder threatened foreclosure. *Id.* Neither the lienholder nor Williams took any action, until, roughly five years later, the lienholder sent Williams a notice of foreclosure. *Id.* About a month after that, counsel for Williams sent the lienholder a letter stating, "In consideration for your ceasing foreclosure proceedings . . . my client . . . will commence making payments . . . on the unpaid balance each month until [separate proceedings alleging negligent title examination are complete]." *Id.* Williams sought reimbursement of those payments not directly from the lienholder, but in a lawsuit against the law firm who had performed the title examination and the Clerk of Court who had misindexed the deed of trust. *Id.* After articulating the above principles and examining *Vick*, the Court found against Williams. Specifically, the Court found that

> Williams knew all the facts. He made payments on the advice of counsel. He did not face the immediate loss of his property. He had ample opportunity to resort to litigation to test the validity of the noteholder's demand for payment. . . . Williams could have presented the facts to the trial court in the foreclosure proceeding, upon proper pleadings, and secured a permanent injunction against foreclosure.

*Id.* at 615. Thus, unlike *Vick*, Williams's payments were made "as a volunteer," rather than by compulsion, and he could not seek repayment.

Here, while sympathetic to the landowners' plight at the hands of Camacho, we are compelled to reach a similar result.

Like *Williams* and unlike *Vick*, the owners "did not face the immediate loss of [their] property." *Id.* Harwood sent the owners the final notice of default on April 28, 2022, scheduling foreclosure for May 31, 2022. Exactly like *Williams*, rather than "resort[ing] to litigation," on the advice of counsel and by letter dated May 16, 2022, the landowners voluntarily agreed to make payments "[i]n exchange for . . . cancel[ling] the foreclosure auction sale." Subsequently, despite "ample opportunity to resort to litigation to test the validity of the noteholder's demand for payment," *Williams*, 237 Va. at 615, the landowners made payments for a year and a half and only initiated this action in August 2023, after receiving a new notice of default. While the landowners filed a motion for temporary injunction in October 2023 to stop the foreclosure proceedings, rather than litigating the matter, the parties entered an "Agreed Injunction Order" whereby the landowners voluntarily agreed to make payments to Harwood during the pendency of the proceedings. Just as in *Williams*, the landowners "could have presented the facts to the trial court in the foreclosure proceeding," *id.*, or otherwise sought equitable relief in May 2022 instead of sending a letter voluntarily agreeing to make payments. But they chose not to. Thus, although Harwood's lien was declared void and his demand for payment "subsequently turned out to be unauthorized by law," *id.* at 613 (quoting *Wessel*, 125 Va. at 510), because the landowners voluntarily agreed to make interest payments where other courses of action were available, they cannot now seek to recoup that money.[9]

---

[9] We acknowledge that the *Williams* Court also considered whether its finding that Williams made payments voluntarily would "lead to a wholly inequitable result." 237 Va. at 615. This language derived from *Criterion Insurance Co v. Fulgham*, 219 Va. 294 (1978). There, the Court declined to apply the voluntary-payment doctrine because it would have been a "wholly inequitable result" to allow an insurance claimant to recover in excess of his policy due to an unrepresented claim adjuster's mistake of law regarding the claimant's coverage. *Id.* at 300; *see id.* at 298-300. The *Williams* Court distinguished *Fulgham*, finding that those same considerations were not at issue in the case before it because "money was actually owed to the noteholder," there was "no contention . . . that the noteholder was unjustly enriched," and Williams sought repayment from parties other than the noteholder. *Williams*, 237 Va. at 615.

Accordingly, the court erred by ordering reimbursement of the interest payments paid by the landowners to Harwood in the amount of $148,759, and we reverse that portion of its judgment.

CONCLUSION

When the General Assembly evinces a clear intent through the inclusion or omission of specific language in a statute, courts are not at liberty to undermine that legislative intent. Here, because Harwood relied on a power of attorney that was not in fact "verified before a notary public," the protections of Code § 64.2-1617(b)-(c) were unavailable to it, and its lien was void ab initio. Notwithstanding this fact, the landowners were not entitled to recoup voluntary payments made on Harwood's loan. Accordingly, we affirm in part and reverse in part the judgment of the circuit court.

*Affirmed in part, reversed in part, and remanded for entry of final judgment.*

---

Although the landowners' circumstances differ somewhat from Williams's, we similarly find that *Fulgham* is inapposite. Notwithstanding the *Williams* Court's brief foray into the equities of that case, the Court went on to reiterate in the same paragraph that, unlike the unrepresented claim adjuster in *Fulgham*, Williams had "ample opportunity—without risking loss to his property—to determine in court his obligation to pay the amounts claimed by the noteholder." *Id.* In other words, the Court's application of the voluntary-payment doctrine turned not on equitable considerations but, again, on whether payment was made under compulsion.

Further, this analysis is consistent with the Supreme Court's recent examination of the voluntary-payment doctrine in *Sheehy v. Williams*, 299 Va. 274 (2020), where the Court explained that the application of the voluntary-payment doctrine turns entirely on whether the payment was "compel[led]." *Id.* at 279; *see id.* at 280 ("The antonym of voluntary—involuntary—does not mean inconvenient. If 'the law would not compel him to make' the payment, the party making the payment has made it voluntarily." (quoting Costello & Sinclair, *supra*, at § 9-2)). The *Sheehy* Court did not address the language from *Fulgham* or provide any suggestion that a court must inquire into the equities of a case in considering whether payment was voluntary. *See generally id.* Thus, having already found that the landowners were not compelled in this case, this language from *Fulgham*/*Williams* does not cause us to question our holding here.

- 19 -